No. 15-2180
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

|  |  |  |
|---|---|---|
| ROBERT CARTWRIGHT;<br>DENISE O. SAWYER,<br>Administratrix of the Estate of<br>Jonathan Sawyer, III,<br>Plaintiffs-Appellants,<br><br>and<br><br>JONATHAN SAWYER,<br>Plaintiff,<br><br>v.<br><br>TOWN OF PLYMOUTH; KENNETH<br>CREQUE, in his personal capacity;<br>and JOANNE FLOYD, in her official<br>capacity;<br>Defendants-Appellees. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **ON APPEAL<br>FROM THE UNITED STATES<br>DISTRICT COURT FOR THE<br>EASTERN DISTRICT<br>OF<br>NORTH CAROLINA** |

## BRIEF OF APPELLANTS

THE WEBSTER LAW FIRM
Walter S. Webster, State Bar No. 38578
214 S. William St., Ste. 2
Goldsboro, NC 27530
Telephone:  919-288-2941
Facsimile:  919-882-8590
Email:  walter@websterlawfirm.net
*Attorney for Plaintiffs-Appellants and Plaintiff*

# **TABLE OF CONTENTS**

AUTHORITIES CITED ........................................................................ iii

JURISDICTIONAL STATEMENT ...................................................... 1

Basis for District Court's Subject Matter Jurisdiction........................... 1

Basis for Court of Appeals's Jurisdiction. ............................................ 1

Issues Presented for Review. ............................................................... 2

STATEMENT OF THE CASE ............................................................ 2

Factual History. ................................................................................... 2

Factual Allegations Relevant to Cartwright's Termination. ................. 2

Factual Allegations Relevant to Sawyer's Termination. ..................... 6

Procedural History. ............................................................................ 8

SUMMARY OF THE ARGUMENT ................................................. 11

ARGUMENT ................................................................................... 11

    I.    Standard of Review. ................................................... 11

    II.    The Complaint sufficiently alleged that Appellants' petitioning activities in the instant matter were matters of public concern. ........................ 13

    III.    The Complaint sufficiently alleged that Appellants were subjected to two negative employment actions. ........................................................... 28

    IV.    Appellee Creque is not entitled to qualified immunity. ..................... 29

    V.    Creque's individual actions amounted to an official policy or custom of the Town. ........................................................................................ 32

    VI.    The right to petition government for the redress of grievances has always been a right of the citizens of the several States. ............................... 34

CONCLUSION ................................................................................ 37

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ................ 38

CERTIFICATE OF SERVICE .......................................................... 39

# <u>AUTHORITIES CITED</u>

<u>CASES CITED</u>:

*Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009). ................... 19, 21, 24-27, 30, 31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009). ...................................................... 12, 13

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). ............................... 11, 12

*Borough of Duryea, PA v. Guarnieri*, 131 S. Ct. 2488 (2011). ......................... 14

*Borucki v. Ryan*, 827 F.2d 836 (1st Cir. 1987). ............................................... 31

*Carey v. Brown*, 447 U.S. 455 (1980). ............................................................ 15

*Coman v. Thomas Manuf. Co.*, 325 N.C. 172, 381 S.E.2d 445 (1989). ............ 34

*Connick v. Myers*, 461 U.S. 138 (1983).......................................... 15, 17, 18, 20

*Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996). ....................................... 30, 31

*De Jonge v. Oregon*, 299 U.S. 353 (1937). ..................................................... 35

*DiMeglio v. Haines*, 45 F.3d 790 (4th Cir. 1995). ..................................... 30, 31

*Givhan v. Western Line Consolidated School District*, 439 U.S. 410 (1979).16, 17

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982). ..................................................... 30

*Jordan by Jordan v. Jackson*, 15 F.3d 333 (4th Cir. 1994). ........................ 32-33

*Kirby v. City of Elizabeth City*, 380 F.3d 777
     (4th Cir. 2004)................................................... 14, 19, 21-23, 30, 31

*Maciariello v. Sumner*, 973 F.2d 295 (4th Cir. 1992). ...................................... 31

*McDonnell v. Tradewind Airlines, Inc.*, 194 N.C. App. 674,
     670 S.E.2d 302 (2009). .................................................................... 34

*Mitchell v. Forsyth*, 472 U.S. 511 (1985). ....................................................... 31

*Myers v. Morris*, 810 F.2d 1437 (8th Cir. 1987). ............................................. 31

*Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130 (4th Cir. 1993). ......................... 11, 13

*Pickering v. Board of Education*, 391 U.S. 563 (1968).................................... 15

*Pritchett v. Alford*, 973 F.2d 307 (4th Cir. 1992). ........................................... 30

*Roth v. United States*, 354 U.S. 476 (1964)...................................................... 15

*Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987).......................................... 33

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676 (4th Cir. 2000). ...................... 13

*Telefax Info. Sys., Inc. v. Arnold*, 132 N.C. App. 680, 670 S.E.2d 85 (1999)... 34

*United States v. Cruikshank*, 92 U.S. 542 (1875)............................................. 35

STATUTES CITED:

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1367 ...............................................................................1

42 U.S.C. § 1983 ...............................................................................1

RULES CITED:

Fed. R. Civ. P. 8 ............................................................................. 13

N.C.R. Civ. P. 8. ............................................................................ 36

N.C.R. Civ. P. 9. ............................................................................ 36

## JURISDICTIONAL STATEMENT

### BASIS FOR DISTRICT COURT'S SUBJECT MATTER JURISDICTION

The actions of Appellees are alleged to have violated provisions of the First and Fourteenth Amendments of the United States Constitution, made actionable pursuant to 42 U.S.C. § 1983. Both Cartwright and Sawyer allege that Appellees violated their rights under the First and Fourteenth Amendments to the United States Constitution by retaliating against them for exercising their Free Speech and Petition Clause rights therein. (R. p. 10 at ¶¶ 76-85).

The dismissals of Cartwright and Sawyer further violate the State cause of action of Wrongful Discharge in Violation of Public Policy. That state law claim is so related to the claims under the provisions of the First and Fourteenth Amendments to the United States Constitution that they form the same case or controversy. Therefore, the District Court had supplemental jurisdiction over said state law claim, pursuant to the provisions of 28 U.S.C. § 1367.

### BASIS FOR COURT OF APPEALS' JURISDICTION

The Court has jurisdiction to hear appeals from the final decisions of the district courts. 28 U.S.C. § 1291 (2015). The instant matter is an appeal from the final judgment of dismissal of all claims entered by the Eastern District of North Carolina on 3 September 2015, (R. p. 151), which disposed of all parties' claims in accordance with the Honorable Louise W. Flanagan's orders entered on 26 March

2015, (*Id.* at 91), and 3 September 2015.  (*Id.* at 132).  Appellants timely filed their Notice of Appeal with the Eastern District of North Carolina on 2 October 2015. (*Id.* at 152).

## ISSUES PRESENTED FOR REVIEW

1.  Whether the Complaint sufficiently alleged that Appellants' Petition claims were matters of public concern.

2.  Whether the Complaint sufficiently alleged that Appellants were subjected to two negative employment actions.

3.  Whether Appellee Creque is not entitled to qualified immunity.

4.  Whether Creque's individual actions amounted to an official policy or custom of the Town.

5.  Whether the right to petition government for the redress of grievances has always been a right of the citizens of the several States.

## STATEMENT OF THE CASE

### FACTUAL HISTORY

**Factual Allegations Relevant to Cartwright's Termination**

On 14 April 2012, Robert Cartwright ("Cartwright") was involved in two investigations: one involving a female subject detained by a Tyrell County deputy sheriff for allegedly stealing property from a business within the Town's jurisdiction and a breaking and entering ("B&E") at a Town residence.  (R. p. 10,

2

¶¶ 9-14).  In the first investigation, Cartwright did not arrest the female subject. He allowed her to remain in the custody of the deputy sheriff who then charged her with possession of stolen goods and transported her to jail.  (*Id.* at ¶¶ 11-12).

In the second investigation, Cartwright responded to the B&E call with his partner, Officer Muhammad.  Officer Muhammad apprehended the alleged perpetrator of the crime several hours later, but Cartwright transported the suspect to the police department.  (*Id.* at ¶¶ 14-16).  Officer Muhammad filed the police report on the B&E incident using the computerized reporting system ("Police-Pak").  (*Id.* at ¶ 19).

When writing the Police-Pak report, Officer Muhammad mistakenly transposed the names of the victims and witnesses.  (*Id.*).  Later that morning, when both Cartwright and Muhammad were headed home after their shifts, Captain Williams of the Town police department called Cartwright and told him "that either [he] or Muhammad need[ed] to return to the [police department] to correct the B&E report."  (*Id.* at ¶ 27).  Cartwright attempted to get Muhammad to return to the department to correct the report, but was unable to reach him (*Id.* at ¶ 28).

Cartwright then called Investigator Peal, another officer in the police department, and Jonathan Sawyer, III ("Sawyer"), who was Cartwright's immdediate supervisor but who was home on leave at the time, to "express

3

unhappiness with the idea he would have to return to [the police department]" and confirm what he regarded as standard practice with respect to correcting such reports. (*Id.* at ¶¶ 29-31). Sawyer agreed to correct the Police-Pak report on Cartwright's behalf. (*Id.* at ¶¶ 35, 37).

Cartwright did not return to the police department. Rather, he called Investigator Peal to state that Sawyer had corrected the report. (*Id.* at ¶ 38). Peal then stated that Officer Muhammad would need to return to the department. (*Id.* at ¶ 40). Cartwright did not speak to Captain Williams, but concluded that the Captain rescinded his original directive to return to the department because Peal, who was in Captain Williams's presence, said that only Muhammad needed to return. (*Id.* at ¶ 43). Cartwright did not believe that his failure to return to the police department as directed by Captain Williams was insubordination "as it was not the declination of a request or command as the result of a positive intention to disobey." (*Id.* at 45). He suggests that this belief was consistent with the Town's employment policy, which defines "insubordination" as a "[r]efusal to accept a reasonable and proper assignment from an authorized superior." (*Id.*).

On 23 April 2012, Captain Williams notified Cartwright that he would be suspended for two days without pay. (*Id.* at ¶ 46). Williams provided four grounds for this suspension: (a) inaccurate information entered into the B&E incident report; (b) failure to follow the chain of command by contacting Sawyer,

who was home on medical leave, rather than other members of the chain; (c) insubordination for failure to obey Captain Williams's order to return to the police department to correct the mistaken report; and (d) mishandling the investigation of the female subject who allegedly stole property by failing to contact the business owners and make an arrest. (*Id.*).

Cartwright appealed his suspension to the then-Town Manager, defendant Creque, on 23 April 2012. (*Id.* at ¶ 47). Creque initially denied Cartwright's appeal by letter dated 10 May 2012. In that letter, he upheld all of the allegations of misconduct presented by Captain Williams. (*Id.*). Cartwright then requested a hearing on the matter through counsel, which Creque granted on 18 May 2012.

After the hearing, Creque upheld the suspension and took the additional action of terminating Cartwright's employment. (*Id.* at ¶ 52). In his findings in support of his decision, Creque determined that Cartwright had not failed to complete incident documents, to follow the chain of command, or to make an arrest in contravention of departmental policy. Creque found that Cartwright had, however, admitted to willfully refusing to follow a directive from Captain Williams and to threatening to resign during the dispute. (*Id.* at ¶ 50). He also found that Cartwright refused a directive from his appointed supervisor, Investigator Peal. (*Id.*).

The Town's grievance policy governing disputes between employees provides: "Employees subject to this Article shall have the opportunity to be heard without fear of reprisal or retaliation. . . ." (*Id.* at ¶ 51).

**Factual Allegations Relevant to Sawyer's Termination**

After a period of medical leave, Sawyer sought to return to work with the police department on 23 April 2012, but did not submit the required medical release form. (*Id.* at ¶ 54). He spent several days negotiating with Captain Williams and the Town's human resources representative about the proper procedure before Williams ordered Sawyer to return to work on 27 April 2012. (*Id.* at ¶¶ 54-56).

On 16 May 2012, Sawyer attended a meeting with Williams, Chief Steve O'Neal ("Chief O'Neal"), and Creque during which he discussed the dispute over the medical release form. During this meeting, Creque stated that Sawyer had been reported as working for his wife's company in potential violation of the Town's outside employment policy. (*Id.* at ¶ 58). Sawyer replied that he received no compensation for his work at his wife's business. (*Id.*). Creque then demanded that Sawyer submit a written request to be able to continue to work in his wife's business, which Sawyer did. (*Id.* at ¶ 59).

On 3 June 2012, before receiving a reply to his request to continue outside employment, Sawyer was asked by Investigator Peal if he would do a job for a

local wrecker company which needed someone to fill in at the scene of an accident. (*Id.* at ¶ 60). Sawyer, who had previously worked for a wrecker company, took the job right away. While he was at the scene, Sawyer was photographed by Jennifer O'Neal (wife of Chief O'Neal), who worked for a competing wrecker company. Ms. O'Neal gave the pictures to Chief O'Neal. (*Id.* at ¶ 61).

On 8 June 2012, Sawyer received a letter from Creque granting him permission to continue his work with his wife's business under the condition that Sawyer work there only while he was off duty with the police department; that he stay away from the business during duty hours for any reason other than official police business; and that he not "work for, or provide favours [sic] for, friends, or family with their businesses, under any circumstances." (*Id.* at ¶ 62).

Other employees with the Town police department had outside employment ranging from working for a funeral home or a gutter business to cleaning cottages at the beach for a realty company. (*Id.* at ¶ 71). He contends further that these employees were not required to get permission for such employment nor disciplined for having it. (*Id.*).

After receiving the 8 June 2012 letter from Creque, Sawyer approached Town Councilperson Mary Nixon ("Nixon") and showed her the letter from Creque. (*Id.* at ¶ 63). Sawyer then presented her with two alternate versions of the Town's outside employment policy that he had drafted. (*Id.*).

7

On 21 June 2012, Chief O'Neal suspended Sawyer for four days until a pre-disciplinary hearing that would be held on 25 June 2015. (*Id.* at ¶ 65). Chief O'Neal cited four violations of Town policy at this meeting. (*Id.*). Sawyer was charged with: (1) one count of working at an unreported job, which Sawyer understood to refer to his work for the wrecker company; (2) one count of transmitting confidential information, which Sawyer understood to his entry of a correction to Officer Muhammad's Police-Pak report discussed above; (3) one count of employee harassment, which Sawyer understood to refer to Creque's perception that Sawyer's discussion with Nixon was an effort to coerce Creque into changing his position expressed in the letter from 8 June 2012; and (4) two counts of insubordination, which Sawyer understood to refer to violations of Creque's "announcement that Town employees were not permitted to talk to Town councilmembers concerning any administrative policy or policies." (*Id.* at ¶ 67).

At a meeting on 20 July 2012, Creque and Chief O'Neal terminated Sawyer from his employment with the Town police department. (*Id.* at ¶ 70).

## PROCEDURAL HISTORY

Cartwright and Sawyer, both former police officers with the Plymouth Police Department, commenced this action on 29 June 2014, against Appellee Plymouth; Appellee Kenneth Creque, in his personal capacity as former Town Manager of Plymouth; and Appellee Floyd, in her official capacity as current

Town Manager of Plymouth. Appellants asserted that defendants violated their federal constitutional rights in the course of disciplining them and terminating their employment with the Plymouth Police Department. Appellants asserted five claims: (1) retaliation for exercise of First Amendment right of freedom of speech, in violation of 42 U.S.C. § 1983, (2) retaliation for exercise of First Amendment right to petition for redress of grievances, in violation of 42 U.S.C. § 1983, (3) a state common law claim for Wrongful Discharge in Violation of Public Policy, (4) denial of equal protection under the law, in violation of 42 U.S.C. § 1983, and (5) violation of the Fair Labor Standards Act.  (R. p. 10).  On 18 August 2014, Appellants filed a voluntary dismissal as to the Fair Labor Standards Act claims only.  (*Id.* at 47).

On 25 August 2014, Appellees Floyd and Plymouth filed a motion to dismiss all claims against them for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6). (*Id.* at 49).  In his Response to that Motion to Dismiss, Cartwright abandoned his Equal Protection claim.  On 10 November 2014, Appellee Creque filed a motion to dismiss for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6).  (*Id.* at 59).  On 24 November 2014, Sawyer passed from this world, leaving his wife, Denise O. Sawyer, and son surviving him.  (*Id.* at 63).  On 29 December 2014, Appellants moved to substitute

Denise O. Sawyer, Administratrix of the Estate of Jonathan Sawyer, III, as party-plaintiff. (*Id.* at 65).

In an M&R dated 9 February 2015, the Magistrate Judge recommended the Court dismiss all claims against Appellees Floyd and Plymouth, on the basis that Appellants had not alleged that the alleged constitutional violations were the result of an official policy or custom of Plymouth. (*Id.* at 70). In addition, it was recommended that the Court dismiss the wrongful discharge claim against Plymouth because Appellants failed to identify a North Carolina statutory or constitutional provision that was violated by their termination. (*Id.*). Appellants timely objected to the M&R. (*Id.* at 83). On 17 March 2015, the district court allowed Appellants' Motion to substitute Denise O. Sawyer, Administratrix of the Estate of Jonathan Sawyer, III, as the proper party-plaintiff. (*Id.* at 89).

On 26 March 2015, the court adopted the M&R, and granted Appellee Plymouth and Appellee Floyd's motion to dismiss. (*Id.* at 91). On 21 July 2015, the Magistrate Judge issued an M&R recommending dismissal of all claims against Appellee Creque, for failure to state a claim. (*Id.* at 104). Appellants filed objections on 4 August 2015. (*Id.* at 125). On 3 September 2015, the court adopted the M&R, and granted Appellee Creque's motion to dismiss. (*Id.* at 132). Also on 3 September 2015, the District Court entered a final judgment of dismissal

as to all claims.  (*Id.* at 151).  Cartwright and Sawyer timely filed their Notice of Appeal on 2 October 2015.  (*Id.* at 152).

## SUMMARY OF THE ARGUMENT

Cartwright and Sawyer were terminated from their public employment with the Town of Plymouth because they refused to simply take their punishment and move on.  Instead, they chose to stand up for themselves, exercising their inalienable right to petition government for the redress of grievances.  In doing so, they raised the ire of Appellees, who terminated them in order to send the message that standing up for one's rights will cost one his job.  It is precisely that type of retaliation that is so heinous to this country's sense of ordered government and why this Court should reverse the ruling of the District Court and remand this matter to proceed to the discovery phase.

## ARGUMENT

**I. Standard of Review.**

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the Complaint in a light most favorable to the plaintiff."  *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). In order to survive a 12(b) challenge however, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "[O]nce a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. To withstand a motion to dismiss however, a complaint must contain "enough facts to state a claim to relief that is plausible on its face". *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In *Iqbal*, the United States Supreme Court articulated a two-step process for determining whether a Complaint meets this plausibility standard. First, the Court identified allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. *Id.* at 680-81. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* at 681 (holding allegation that government officials adopted challenged policy "because of" its adverse effects on a protected group was conclusory and not assumed to be true) (citing *Twombly*, 550 U.S. at 554-55). Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark[] a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79.

Second, to the extent that well-pleaded factual allegations exist, the Court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 681. Determining whether a complaint contains sufficient facts to state a plausible claim for relief "will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and it therefore should be dismissed. *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). However, all inferences are required to be made in the favor of the non-movant. *Matkari*, 7 F.3d at 1134.

## II.   The Complaint sufficiently alleged that Appellants' petitioning activities in the instant matter were matters of public concern.

Cartwright and Sawyer have sufficiently alleged the three required elements for First Amendment Retaliation based upon their petitioning activities. This Court has recognized that a plaintiff seeking to recover under § 1983 for retaliation must establish three elements: (1) the plaintiff's actions were protected; (2) the plaintiff suffered some adverse action in response to his or her exercise of a protected right; and (3) a causal relationship between the plaintiff's actions and the defendant's retaliatory action. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685-86 (4th Cir. 2000).

Cartwright's and Sawyer's petitioning activities were protected under the First Amendment to the United States Constitution, because they were a matter of public concern. The public concern analysis and balancing test applicable to free speech claims is now equally applicable to First Amendment claims raised under the Petition Clause. The Supreme Court has held that:

> The substantial government interests that justify a cautious and restrained approach to the protection of speech by public employees are just as relevant when public employees proceed under the Petition Clause. Petitions, no less than speech, can interfere with the efficient and effective operation of government. A petition may seek to achieve results that "contravene governmental policies or impair the proper performance of governmental functions."

*Borough of Duryea, PA v. Guarnieri*, 131 S. Ct. 2488, 2495 (2011) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). If a public employee petitions as an employee on a matter of purely private concern, the employee's First Amendment interest must give way, as it does in speech cases. *Id.* at 2500 (citations omitted). Indeed, this Court has long recognized that "a public employee's petition, like his speech, is constitutionally protected only when it addresses a matter of public concern. *Kirby v. City of Elizabeth City*, 380 F.3d 777, 785 (4th Cir. 2004). For the purposes of this appeal, the remaining authorities cited concerning the constitutional protection for speech by public employees is intended to inform the Court as to the manner in which the petitioning conduct in this matter should be reviewed.

In *Pickering v. Board of Education*, the Supreme Court held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its allocation of school funds between athletics and education and its methods of informing taxpayers about the need for additional revenue.  391 U.S. 563 (1968).  Specifically, the Court found that the subject of Pickering's speech was "a matter of legitimate public concern" upon which "free and open debate is vital to informed decision-making by the electorate."  *Id.* at 571-572.  *Pickering* evolved from a line of cases the Supreme Court had considered where the invalidated statutes and actions sought to suppress the rights of public employees to participate in public affairs.  *Connick v. Myers*, 461 U.S. 138, 144-45 (1983).  The explanation for the Constitution's special concern with threats to the right of citizens to participate in political affairs is no mystery.  The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1964).  Accordingly, the Supreme Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the heirarchy of First Amendment values," and is entitled to special protection. *Carey v. Brown*, 447 U.S. 455, 467 (1980).  Because both Cartwright's and Sawyer's speech in the instant matter concerned matters of public concern, their

termination in retaliation for their speech was a violation of their First Amendment right to freedom of speech.

Speech made in private, rather than in public, is protected by the First Amendment. In *Givhan v. Western Line Consolidated School District*, the Court held that First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly. 439 U.S. 410 (1979). In that case, the plaintiff, a teacher, had arranged for a series of meetings with her principal during which she made demands and complaints against employment policies and procedures that she believed to be discriminatory in purpose or effect. *Id.* at 412-13. The District Court in that case found, after a two-day bench trial, that "the primary reason for the school district's failure to renew [her] contract was her criticism of the policies and practices of the school district, especially the school to which she was assigned to teach," and reinstated Givhan, holding that her dismissal violated her First Amendment right to free speech. *Id.* at 413 (internal quotation omitted). The District Court's decision was reversed by the Fifth Circuit, which held that: "[B]ecause [Givhan] had privately expressed her complaints and opinions to the principal, her expression was not protected under the First Amendment." *Id.* The Supreme Court, in a unanimous opinion, rejected the Fifth Circuit's holding, stating:

> We are unable to agree that private expression of one's views is beyond constitutional protection, and therefore reverse the Court of Appeals'

judgment and remand the case so that it may consider the contentions of the parties freed from this erroneous view of the First Amendment.

This Court's decisions in *Pickering*, *Perry*, and *Mt. Healthy* do not support the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly. While those cases each arose in the context of a public employee's public expression, the rule to be derived from them is not dependent on that largely coincidental fact.

. . . .

The First Amendment forbids abridgment of the "freedom of speech." Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment.

*Id.* at 413-16.  To be clear, the subject-matter of Givhan's statements were not the issue before the Court in the *Givhan* case.  However, the Supreme Court has, at a later time, recognized that her statements concerning the school district's allegedly racially discriminatory policies involved a matter of public concern.  *Connick*, 461 U.S. at 146.  In the case at bar, Cartwright's petitioning was directed through the chain of command up to and including Creque, the then Town Manager.  (R. p. 10 at ¶¶ 27-30, 34-40, 47, 49-50, and 52).  Additionally, Sawyer's petitioning was directed not only through the chain of command, but also to an elected Town official.  (*Id.* at ¶¶ 54-59 and 63-70).  Because petitioning within the chain of command is protected by the First Amendment, this Court must consider whether

the subject matter of the speech itself was upon a matter or matters of public concern.

Cartwright was terminated because he challenged his suspension based upon what he believed to be baseless allegations. Whether a petition "addresses a matter of public concern must be determined by the content, form, and context of a given [petition], as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Cartwright was originally suspended for two days based on four grounds:

> (a) Inaccurate information entered on an incident report regarding an April 16, 2012 breaking an entering at 502 East Third Street.
>
> (b) Failing to follow the chain of command by contacting Corporal John Sawyer for his assistance in correcting the inaccurate report while Corporal Sawyer was on medical leave and not on active duty.
>
> (c) Insubordination for failure to follow an instruction to return personally to the police department for the purpose of correcting the inaccurate report.
>
> (d) Mishandling an investigation regarding two (2) females that had admitted to taking signs from a business located in Plymouth, chiefly by failing to contact the owner/manager of the business to determine if anyone had been given permission to remove the signs, and by failing to "arrest the perpetrators of the aforementioned crime.

(R. p. 10 at ¶ 46). On 23 April 2012, Cartwright submitted a written response to the grounds cited in his original notice of suspension, taking issue with each of the cited grounds. (*Id.* at ¶ 47). Creque, in response to Cartwright's then counsel's request for a formal hearing, requested answers to certain issues raised by the grounds for the original suspension. (*Id.* at ¶ 49). After Cartwright spoke via his

written response on 23 April 2012 and in his hearing thereafter, Creque unsubstantiated, disavowed, and struck three of the four grounds that supported the original two-day suspension, but used the one remaining ground to terminate Cartwright. (*Id.* at ¶ 50). Cartwright's petitions in his 23 April 2012 written response and his speech at his own hearing implicated a matter of public concern for First Amendment purposes—namely whether the Town Manager retaliated against him for challenging baseless allegations that caused him a two-day suspension—even though his petition related to a private matter. *See Kirby*, 388 F.3d at 449; *Andrew v. Clark*, 561 F.3d 261, 269 (4th Cir. 2009). The Town had a policy that allowed employees to have the opportunity to be heard without fear of reprisal or retaliation. (R. p. 10 at ¶ 51). The reprisal and retaliation against Cartwright for exercising his right to be heard is a matter of public concern as such reprisal slaps the notion of ordered government and society in the face and is particularly offensive to the First Amendment of the Constitution. Since even speech done solely within the chain of command is protected by the First Amendment, and since whether the Town Manager retaliates against an employee in violation of the Town's own policy protecting such speech is a matter of public concern.

Sawyer was terminated because he petitioned regarding a policy instituted by the Town Manager that seemingly prohibited him from doing any work, even

on a volunteer basis, for friends or family. Again, whether a petition "addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Sawyer had been working for his wife's business on a volunteer basis prior to the imposition of the Town's outside employment policy. (R. p. 10 at ¶ 58). Despite those facts, Creque raised Sawyer's working as a volunteer for his wife in a meeting on 16 May 2012. (*Id.* at ¶ 58). In that meeting, Sawyer informed Creque that the policy did not apply to his volunteer work for his wife. (*Id.* at ¶ 58). At that time, the outside employment policy remained as it was, prohibiting only compensated work. On 3 June 2012, Sawyer went on an uncompensated wrecker call to help a friend. (*Id.* at ¶¶ 60-61). It was not until 8 June 2012 that Creque restricted Sawyer from doing any work on even a volunteer basis for friends or family. (*Id.* at ¶ 62). On 12 June 2012 and 20 June 2012, Sawyer, in disbelief that he was prohibited from doing even volunteer work for friends or family, communicated with Town Councilperson Mary Nixon regarding the no volunteer work policy. (*Id.* at ¶¶ 63-64). Sawyer also relayed his concerns over that policy to Creque directly at their 25 June 2012 meeting. (*Id.* at ¶ 68). It has to be beyond doubt that a policy restraining public servants from serving the public in their free time without compensation is a matter of public concern. While the issue arose in the context of an initially private concern, Sawyer's petitions to Nixon and Creque

concerned a matter of public concern and was thus protected by the First Amendment.

Plaintiffs' First Amendment Claims are, when looked at in the aggregate, most identical to the cases of *Kirby*, 380 F.3d 777, and *Andrew*, 561 F.3d 261. In both of those cases, this Court held that the plaintiffs' claims survived as a matter of law. The same is true in this case and, as such, the District Court's dismissal of these claims should be reversed.

The *Kirby* case involved Carl Edward Kirby, who was a police officer with the City of Elizabeth City, North Carolina. *Kirby*, 380 F.3d. at 780. Kirby had been called to testify at a hearing before a City Personnel Appeals Committee concerning a grievance filed by his fellow officer, James Henning. *Id.* Henning had been disciplined for damaging a patrol car by allegedly neglecting proper maintenance for the vehicle. *Id.* At the hearing, Kirby testified regarding Henning's driving habits, his opinion of Henning's maintenance of the vehicle, and how transmission leaks are diagnosed. *Id.* Kirby believed that the testimony angered City Police Chief Hampton and City Police Lieutenant Koch, because, after giving the testimony at the hearing, Kirby left on a previously scheduled vacation, only to return to discover that he had been issued a reprimand for "failure to support the Department's Administration." *Id.* (internal quotation and alteration omitted). In reaction to the reprimand, Kirby filed a grievance challenging the

punishment he received and filed suit on 31 August 2001, alleging that the reprimand was in retaliation for his testimony. *Id.* On 4 September 2001, Kirby received notice that Hampton had demoted him from Sergeant to Police Officer III. *Id.* at 780-81. Hampton and Koch claimed that the demotion was because of Kirby's job performance, based on an audit of his cases, in that he had not complied with departmental policy in supplementing investigations. *Id.* at 781. Kirby maintained that the supplement policy had not been previously enforced and that some of the cases identified in the demotion were not subject to that policy. *Id.* Kirby subsequently amended his complaint to include claims related to this demotion. *Id.*

In ruling on the *Kirby* case, Chief Judge Wilkins stated in the panel's unanimous opinion that Kirby's second-level retaliation claim was premised upon a matter of public concern. Kirby centered his Petition Clause claim on the idea that his testimony, which displeased the Chief and Lietenant, led to his reprimand, which led to his filing a grievance and law suit, which led to his termination. *Id.* at 780-81. In holding that the Petition Clause claim survived, Judge Wilkins noted that "[t]he critical factor supporting our conclusion is not that Kirby was allegedly unjustly reprimanded, but rather, that the reprimand could have a chilling effect on him and other officers." *Id.* at 786. Judge Wilkins went on to elaborate that:

> It could be argued that because Kirby's testimony did not involve a matter of public concern, his allegation of retaliation based on that testimony is not

sufficiently significant to involve a matter of public concern. Although we recognize that this issue is a close one, we conclude that the allegedly unwarranted reprimand could have a significant chilling effect on testimony relating to matters of public as well as private concern. One who believes that the police chief and his lieutenant are willing to punish adverse testimony and lie about the reason for it is likely also to suspect that those officials would engage in retaliation even when such retaliation might be unconstitutional. For these reasons, we conclude that Kirby's allegation in his grievance and first complaint that he was reprimanded based on his testimony at a disciplinary hearing implicates a matter of public concern even though the testimony itself related to a private matter.

*Id.* at 786-87. The same is true in the instant case. Cartwright was terminated because he spoke out against his suspension based upon what he believed to be baseless allegations. Cartwright was originally suspended for two days based on four grounds:

> (a)    Inaccurate information entered on an incident report regarding an April 16, 2012 breaking an entering at 502 East Third Street.
> (b)    Failing to follow the chain of command by contacting Corporal John Sawyer for his assistance in correcting the inaccurate report while Corporal Sawyer was on medical leave and not on active duty.
> (c)    Insubordination for failure to follow an instruction to return personally to the police department for the purpose of correcting the inaccurate report.
> (d)    Mishandling an investigation regarding two (2) females that had admitted to taking signs from a business located in Plymouth, chiefly by failing to contact the owner/manager of the business to determine if anyone had been given permission to remove the signs, and by failing to "arrest the perpetrators of the aforementioned crime.

(R. p. 10 at ¶ 46). On 23 April 2012, Cartwright submitted a written response to the grounds cited in his original notice of suspension, taking issue with each of the cited grounds. (*Id.* at ¶ 47). Creque, in response to Cartwright's then counsel's

request for a formal hearing, requested answers to certain issues raised by the grounds for the original suspension. (*Id.* at ¶ 49). After Cartwright spoke via his written response on 23 April 2012 and in his hearing thereafter, Creque unsubstantiated, disavowed, and struck three of the four grounds that supported the original two-day suspension, but used the one remaining ground to terminate Cartwright. (*Id.* at ¶ 50). Cartwright's petitions in his 23 April 2012 written response and his speech at his own hearing implicated a matter of public concern for First Amendment purposes—namely whether the Town Manager retaliated against him for challenging baseless allegations that caused him a two-day suspension—even though his petitions related to a private matter.

In the *Andrew* case, Michael Andrew was employed by the Baltimore Police Department ("BPD") from June 1973 until his termination in September 2004, at which time he served as a Major in the Department. *Andrew*, 561 F.3d at 264. In December 2003, an elderly man, upset over a rent increase, killed his landlord and barricaded himself in his apartment. *Id.* Andrew responded to the barricade situation along with three other commanders. *Id.* Andrew's only responsibility at the scene was to supervise the officers performing perimeter street control. *Id.* Andrew requested a Technical Assistance Response Unit ("TARU") look inside the man's apartment to gain additional intelligence and instructed BPD officers to continue to attempt to negotiate with the man. *Id.* However, TARU officers under

the command of another BPD commander arrived at the scene, entered the man's apartment, and shot and killed the man. *Id.* After the shooting, Andrew requested to be included in the review and investigation of the shooting, but was consistently excluded from the investigation and review team. *Id.* On 17 December 2003, Andrew submitted a memorandum to a former police commissioner of the Department, which expressed Andrew's opinion that the shooting was not handled properly and was not justified. *Id.* Andrew was under no duty to write the memorandum and would not have been neglecting his duties if he had not written it at all. *Id.* The former police commissioner ignored Andrew's memorandum, which prompted Andrew to contact a reporter from the Baltimore Sun newspaper, to whom Andrew provided a copy of his memorandum. *Id.* at 264-65. On 6 January 2004, the Baltimore Sun published an article regarding the shooting and highlighting the concerns raised by Andrew in his memorandum. *Id.* at 265. Following publication of that article, Andrew became the subject of an Internal Affairs investigation, was charged with disclosing confidential internal information to the media, lost command of the BPD's Eastern District, was placed in a less desirable position in the Evidence Control Unit, and lost a stipend of $3,900 a year he previously received as a District Commander. *Id.* In July 2004, Andrew was ordered to retire, which he refused to do unless the Internal Affairs investigation charges were dismissed and he was awarded paid time off. *Id.* The BPD refused

this offer and placed Andrew on "out of pay" status, terminating his compensation and benefits. *Id.* Despite this harsh treatment, Andrew returned to the BPD and made himself available for work. *Id.* While working without pay, Andrew's counsel wrote to the administration as well as the City Solicitor, informing them that Andrew's First Amendment rights were being violated and that Andrew intended to bring multiple claims against multiple defendants for violating his civil rights. *Id.* Andrew was terminated on 20 September 2004. *Id.*

In deciding the *Andrew* appeal, Senior Judge Alarcón reversed the district court's 12(b)(6) dismissal of Andrew's First Amendment claims. In his opinion, Judge Alarcón stated that:

> Whether Andrew's delivery of his memorandum to a reporter for the Baltimore Sun addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. Only if Andrew's speech is found to address a matter of public concern does the court then seek a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. Resolution of these questions will depend upon the results of discovery as tested by a motion for summary judgment.

> We also determine that the district court erred in dismissing Andrew's petition claims on the grounds that his claims did not, as a matter of law, involve issues of public concern. Andrew maintains that his petition claims implicate a matter of public concern, namely whether the BPD retaliates against police commanders who publicly disagree with the necessity of a police-involved shooting.

> Andrew alleged that he was retaliated against for petitioning the government to redress his grievances. Specifically, Andrew alleged a form of second-

level retaliation—that he was terminated in retaliation for threatening to file suit regarding the original retaliation he faced upon disseminating his memorandum to the press. The facts alleged in the second amended complaint are similar to those found in *Kirby v. City of Elizabeth City*. In *Kirby*, this Court held that the plaintiff police officer's second-level retaliation claim implicated matters of public concern for First Amendment purposes even though his initial speech related to a private matter.

. . . Andrew has asserted viable petition claims because he alleges that the first-level retaliation was an Internal Affairs investigation due to his distribution of his memorandum to the press, and that the second level of retaliation was his termination for threatening to file suit for the first level of retaliation. Accordingly, the district court erred in dismissing Andrew's petition claims.

*Id.* at 268-69 (internal citations and quotations omitted). The same is true with regard to Sawyer's First Amendment claims. Sawyer was terminated because he petitioned regarding a policy instituted by Creque that seemingly prohibited him from doing any work, even on a volunteer basis, for friends or family. Sawyer had been working for his wife's business on a volunteer basis prior to the imposition of the Town's outside employment policy. (R. p. 10 at ¶ 58). Despite those facts, Creque raised Sawyer's working as a volunteer for his wife in a meeting on 16 May 2012. (*Id.* at ¶ 58). In that meeting, Sawyer informed Creque that the policy did not apply to his volunteer work for his wife. (*Id.* at ¶ 58). At that time, the outside employment policy remained as it was, prohibiting only compensated work. On 3 June 2012, Sawyer went on an uncompensated wrecker call to help a friend. (*Id.* at ¶¶ 60-61). It was not until 8 June 2012 that Creque restricted Sawyer from doing any work on even a volunteer basis for friends or family. (*Id.*

at ¶ 62).  On 12 June 2012 and 20 June 2012, Sawyer, in disbelief that he was prohibited from doing even volunteer work for friends or family, communicated with Town Councilperson Mary Nixon regarding the no volunteer work policy. (*Id.* at ¶¶ 63-64).  Sawyer also relayed his concerns over that policy to Creque directly at their 25 June 2012 meeting.  (*Id.* at ¶ 68).  It has to be beyond doubt that a policy restraining public servants from serving the public in their free time without compensation is a matter of public concern.  While the issue arose in the context of an initially private concern, Sawyer's speech to Nixon and Creque was concerning a matter of public concern and was thus protected by the First Amendment.  For these reasons, the decision of the lower court should be reversed.

### III.   The Complaint sufficiently alleged that Appellants were subjected to two negative employment actions.

The District Court incorrectly found that Cartwright and Sawyer were only subjected to one negative employment action.  (R. pp. 147-48).  Cartwright had his first negative employment action when he was suspended without pay in writing by Williams.  (R. p. 10 at ¶ 46).  Cartwright appealed that decision in writing, containing a response denying all the grounds therefor, on 23 April 2012.  (*Id.* at ¶ 47).  Creque denied the appeal, (*Id.*), and stated to Cartwright that: "As far as this office is concerned this matter is closed."  (*Id.* at ¶ 48).  With his appeal denied, Cartwright retained counsel who then requested a hearing, which was granted.  (*Id.* at ¶ 49).  After the hearing, Creque communicated his reasoning for both upholding

the suspension and the additional negative employment action of terminating Cartwright. (*Id.* at ¶ 52). Thereby, Cartwright had been denied two days' pay while still employed and then was separately terminated. Those are two separate and distinct employment actions. Similarly, Sawyer also suffered two separate negative employment actions. On 8 June 2012, Sawyer received a letter from Creque that prohibited him from working for, or providing favors for, friends or family with their businesses, under any circumstances, other than the express permission for his wife's business contained in the same letter. (*Id.* at ¶ 62). That letter prohibited Sawyer from doing volunteer work for friends and family and gave him no recourse to request permission for any volunteer work. That was the first negative employment action, that of restricting his freedom. After receiving Creque's 8 June 2012 letter, Sawyer contacted Nixon on 12 June 2012 and 20 June 2012 seeking to change this new policy of the Town. (*Id.* at ¶¶ 63-64). On 21 June 2012, Sawyer was called into the office and suspended for, among other allegations, one count of employee harassment that Sawyer later learned referred to Sawyer approaching Nixon on 12 June 2012 and 20 June 2012. (*Id.* at ¶¶ 65-67). On 20 July 2012, Creque terminated Sawyer based upon the same allegations from the 21 June 2012 meeting. (*Id.* at ¶ 70). The termination of Sawyer was the second negative employment action that he suffered.

**IV.    Appellee Creque is not entitled to qualified immunity.**

The closely-analogous decisions in *Kirby*, 380 F.3d 777, and *Andrew*, 561 F.3d 261, make clear that Cartwright's and Sawyer's actions were clearly established constitutional rights at the time of the Appellees' actions in 2012, some eight and three years after those decisions by this Court. To avoid excessive disruptions of government, a qualified immunity is recognized to protect government officials performing discretionary functions from civil damage suits "insofar as [the officials'] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Cromer v. Brown*, 88 F.3d 1315, 1324 (4th Cir. 1996). Officials lose the protection of the immunity only if it appears that (1) they violated a statutory or constitutional right of the plaintiff, and (2) the right was "clearly established" at the time of the acts complained of such that an objectively reasonable official in their position would have known of the right. *Id.*; *see also DiMeglio v. Haines*, 45 F.3d 790, 796 (4th Cir. 1995). These are legal questions that are subject to de novo review. *See Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992).

When determining whether a reasonable officer would have been aware of a constitutional right, the courts do not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."

*Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992); *see also Cromer*, 88 F.3d at 1324. Thus, particularly in First Amendment cases, where a sophisticated balancing of interests is required to determine whether the plaintiff's constitutional rights have been violated, "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected." *DiMeglio*, 45 F.3d at 806. On the other hand, where a plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is not entitled to a dismissal prior to the completion of discovery. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). And, where the operative law requires a balancing of competing interests, it is only fair to charge an official with knowledge of the law where there is a previously decided case with clearly analogous facts. *See Borucki v. Ryan*, 827 F.2d 836, 848 (1st Cir. 1987); *see also Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987) ("[I]f the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent."), *cert denied*, 484 U.S. 828 (1987).

As was shown above, Part II *supra*, the cases of *Kirby*, 380 F.3d 777, and *Andrew*, 561 F.3d 261, contained closely corresponding factual circumstances. The *Kirby* case was decided eight years prior to the Appellees' actions, and the

*Andrew* case was decided three years prior to the Appellees' actions. Therefore, the principles recognized in those cases were "clearly established" for the purposes of holding Creque liable for knowledge thereof. Moreover, the Complaint in this matter has a specific factual allegation related to the defense of qualified immunity, which said:

> Defendants knew or should have known that each employee is, at a minimum, permitted to, speak on matters of public concern, pursuant to the First and Fourteenth Amendments to the United States Constitution, petition government for the redress of his or her grievances, pursuant to the First and Fourteenth Amendments to the United States Constitution, and to be equally protected under the law, pursuant to the Fourteenth Amendment to the United States Constitution. Such a right was first recognized by the Fourth Circuit in employment litigation in *Kirby v. City of Elizabeth City*, 380 F.3d 777 (4th Cir. 2004), and was reiterated by the Fourth Circuit in *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009). Those cases having existed [eight] and three years, respectively, prior to the Town's actions, a reasonable person would have known that Defendants' actions violated clearly established constitutional rights.

(R. p. 10 at ¶ 75). For these reasons, the lower court's ruling of dismissal of this action based upon qualified immunity should be reversed.

### V.  Creque's individual actions amounted to an official policy or custom of the Town.

Defendant Creque was a municipal official authorized to make and implement municipal policy. While a municipality is not entitled to assert a qualified immunity defense, it is also not liable under the usual *respondeat superior* principles simply by virtue of it employing an official who does violate a plaintiff's rights. *See Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir.

1994).  On the other hand, a § 1983 plaintiff must show that the officers acted pursuant to an official policy or custom of the municipality.  *Id.*  Such a policy or custom does not necessarily have to derive solely from municipal ordinances and customs, but "may also be found in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy."  *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987) (holding error to dismiss claim where county prosecutor had exercised apparent authority to instruct law enforcement to break down a door to serve process despite there being no official written policy to that effect).  In the case at bar, Creque possessed authority-in-fact to create and promulgate Town policy.  That is easily demonstrated by his creation of a new outside employment policy that he tendered to Sawyer on 8 June 2012.  (R. p. 10 at ¶ 62).  Moreover, with regard to Cartwright, Creque made the initial determination to suspend Cartwright based upon the events of 16 April 2012, and it was Creque to whom the appeal of that decision was taken, and it was Creque who unsubstantiated three of the four grounds supporting the suspension, and it was Creque that then terminated Cartwright after said unsubstantiation.  (*Id.* at ¶¶ 46-47, 49-50).  Therefore, with respect to both Cartwright's and Sawyer's claims, Defendant Creque was a municipal official authorized to make and implement municipal policy. Accordingly, his actions are properly attributable to the Town.

**VI.    The right to petition government for the redress of grievances has always been a right of the citizens of the several States.**

The right to petition government for the redress of grievances has always been a right of the citizens of North Carolina.  Cartwright and Sawyer combined with their First Amendment Retaliation claims a state common law claim for Wrongful Termination in Violation of Public Policy.  (R. p. 10 at ¶¶ 91-96).  In that claim, Cartwright and Sawyer claimed that the violation of their First Amendment right to petition for the redress of grievances by the Town violated public policy.  (*Id.*).  In dismissing that claim, the District Court mistakenly held that there is "no basis in North Carolina law for allowing such a wrongful discharge claim to proceed."  (*Id.* at 102).  In so deciding, the District Court relied on North Carolina precedent holding that "public policy is violated [only] when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes."  (*Id.*) (citing *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353 (1992)).  Federal law public policy cases have concerned either federal statutes or federal regulations.  *E.g. Coman v. Thomas Manuf. Co.*, 325 N.C. 172, 381 S.E.2d 445 (1989) (USDOT regulations); *McDonnell v. Tradewind Airlines, Inc.*, 194 N.C. App. 674, 670 S.E.2d 302 (2009) (FAA regulations); *Telefax Info. Sys., Inc. v. Arnold*, 132 N.C. App. 680, 670 S.E.2d 85 (1999) (federal patent law).  Those federal cases concerned expressions of the federal legislative or quasi-legislative power, which means that they were policies first

34

enunciated and created by the federal government.   The right to petition government for the redress of grievances, however, is a right that has always existed with every citizen and was never ceded to any government.

The United States Supreme Court has long recognized the right to petition as one of the fundamental rights of citizenship.  In *De Jonge v. Oregon*, the Supreme Court stated that:

> Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution. The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental. As this Court said in *United States v. Cruikshank*: "The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." The First Amendment of the Federal Constitution expressly guarantees that right against abridgment by Congress. But explicit mention there does not argue exclusion elsewhere. For the right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions principles which the Fourteenth Amendment embodies in the general terms of its due process clause.

299 U.S. 353, 364 (1937) (emphasis added) (internal citations omitted).  Indeed, the purpose of the Fourteenth Amendment was to ensure that the States did not deny those fundamental rights to their own citizens.  *United States v. Cruikshank*, 92 U.S. 542, 554-55 (1875).  Therefore, this Court's role in deciding this matter is simply to affirm those principles of federalism that have reigned in this country since its inception.  This Court's role is to make clear to North Carolina that the right to petition for the redress of grievances is a right never ceded to any State nor

to the federal government and, thus, any government's role is to ensure that that right is not abridged.

Moreover, while the North Carolina Court of Appeals has erroneously adopted a "specific allegation" requirement for the wrongful discharge in violation of public policy tort, such a requirement runs afoul of the North Carolina Rules of Civil Procedure, which the Court of Appeals is without power to amend. Rule 8 requires that a claim for relief shall include a short and plain statement sufficiently particular to give the court and parties notice of transactions and occurrences intended to be proved and showing the pleader is entitled to relief. N.C.R. Civ. P. 8(a)(1). There has been no contention from Defendants that they were unable to discern from the Complaint what transactions and occurrences were intended to be proved. Moreover, Rule 9 governs what matters must be specifically pleaded; those being capacity of a party that is not a natural person, fraud, duress, mistake, condition of mind, conditions precedent, official documents or acts, judgment, time and place, special damage, private statutes, libel and slander, and medical malpractice. N.C.R. Civ. P. 9. There is no provision in Rule 9 requiring specificity of pleading for one particular element of the wrongful discharge in violation of public policy tort. The Court of Appeals lacks the authority to amend the Rules of Civil Procedure, as they have been enacted by the General Assembly and to amend to require specific pleading requirements where the General

Assembly has not deemed it necessary would be to violate the separation of powers between the branches of the North Carolina State government. Because the Court of Appeals's rule requiring specificity runs afoul of statutes governing pleading, it is more likely that the North Carolina Supreme Court would not uphold such a rule.

## CONCLUSION

For all of the foregoing reasons, Appellants respectfully request this Court to reverse the decision of the District Court and remand the case back to that court for further proceedings.

This the **30th** day of **November**, 2015.

THE WEBSTER LAW FIRM
*Attorney for Plaintiffs-Appellants and Plaintiff*


By: /s/ Walter S. Webster_____
Walter S. Webster, State Bar No. 38578
214 S. William St., Ste. 2
Goldsboro, NC 27530
Telephone: 919-288-2941
Facsimile: 919-882-8590
Email: walter@websterlawfirm.net

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,306 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

 /s/ Walter S. Webster_____

*Attorney for Plaintiffs-Appellants*

30 November 2015_____

Date

# CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause by:

[  ]    Hand delivering a copy hereof to each said party or its attorney.

[  ]    Depositing a copy hereof, postage prepaid in the United States Mail, properly addressed as disclosed by the pleadings on record herein to each said party or its attorney.

[  ]    Via facsimile.

[X]    Via email to the email address for each said party or its attorney through the Court's electronic filing site.

This the **30th** day of **November**, 2015.

_/s/ Walter S. Webster_____
Walter S. Webster
The Webster Law Firm
214 S. William St., Ste. 2
Goldsboro, NC 27530
Tel: 919-288-2941
Fax: 919-882-8590
Email: walter@websterlawfirm.net
*Attorney for Plaintiffs-Appellants and Plaintiff*

**DOCUMENTS SERVED:**
Brief of Appellants

**SERVED UPON:**
Robin Davis
Jackson Lewis, P.C.
1400 Crescent Green, Suite 215
Cary, North Carolina 27518
Email: robin.davis@jacksonlewis.com
*Attorneys for Defendants-Appellees*